## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **TAHIRAH GAINES o/b/o J.F.,** | ) | CASE NO. 1:19-CV-0845 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE DAVID A. RUIZ |
| | ) | |
| **ANDREW SAUL,** | ) | |
| Commissioner of Social Security, | ) | MEMORANDUM OPINION AND |
| | ) | ORDER |
| Defendant. | ) | |

Plaintiff, Tahirah Gaines (Gaines), acting on behalf of J.F., a minor (J.F.), challenges the final decision of Defendant Andrew Saul, Commissioner of Social Security (Commissioner), denying J.F.'s Supplemental Security Income (SSI) claim under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq*. (Act). This court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to consent of the parties. (R. 10). For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I.      Procedural History

On March 18, 2015, Gaines filed an application for SSI benefits on the behalf of her minor son, J.F., with a disability onset date of January 15, 2012. (R. 9, Transcript (Tr.) 154). The application was denied initially on October 7, 2015, (Tr. 96-98), and upon reconsideration on December 2, 2015. (Tr. 84-94). On December 2, 2015, Gaines requested a hearing before an Administrative Law Judge (ALJ). (Tr. 111-116). Gaines and J.F. participated in the hearing on March 28, 2017, were represented by counsel, and testified. (Tr. 33-59).

On August 1, 2018, the ALJ denied Gaines's application, concluding that J.F. was not

disabled within the meaning of the Act. (Tr. 12-32). On February 22, 2019, the Appeals Council

denied Gaines's request to review the ALJ's decision, and the ALJ's decision became the

Commissioner's final decision. (Tr. 1-6). On April 16, 2019, Gaines filed a complaint challenging

the Commissioner's final decision. (R. 1). The parties have completed briefing in this case. (R. 11

& 13). Gaines asserts the following assignments of error:

> 1. At step three, the ALJ found that J.F. did not have an impairment which met
>    a listed impairment. This finding lacks the support of substantial evidence
>    because the ALJ failed to conduct an adequate evaluation to determine
>    whether J.F.'s severe [Attention Deficit Hyperactivity Disorder (ADHD)]
>    met the requirements of Listing 112.11.
>
> 2. At step three, the ALJ found that J.F.'s impairments were not functionally
>    equivalent to a listed impairment. This finding is not supported by
>    substantial evidence when the record establishes that J.F. has marked
>    limitations in the domain of acquiring and using information and marked
>    limitations in the domain of attending and completing tasks.

## II.     Personal Background Information

J.F. was born on September **, 2011, and was three years old on his application date. (Tr.

70). Accordingly, J.F. was a preschooler on the application date and considered a preschooler for

Social Security purposes. See 20 C.F.R. §416.926a(g)(2)).

## III.    Evidence

### A.     Relevant Medical Evidence[1]

On April 28, 2015, J.F. visited Dr. Danielle Massarella, a pediatric gastroenterologist, for

general abdominal pain/cramps, and changes in bowel movements. (Tr. 228). J.F. presented with

a history of asthma, allergic rhinitis, eczema, and malrotation. *Id*. J.F. had abdominal surgery when

---

[1]  The recitation of the evidence is not intended to be exhaustive. It includes only those portions
of the record cited by the parties in their briefs and deemed relevant by the court to the assignments
of error raised.

he was fourth months old. *Id*. Gaines stated that J.F. complained of abdominal pain since the surgery, woke up at night due to abdominal pains, and refused food because of abdominal pain. *Id*. Gaines informed the doctor that J.F. was toilet trained at age two, and since then has tended towards constipation with a history of encopresis. *Id*. Gaines noted that she treated J.F.'s constipation with MiraLAX. *Id*. Dr. Massarella diagnosed J.F. with generalized abdominal pain, unspecified constipation, and altered bowel habits. (Tr. 231).

On July 7, 2015, J.F. visited his pediatrician, Dr. James Liang. J.F.'s chief complaints were stomach problems, uncontrolled bowel movements and urine incontinence. (Tr. 253). Gaines informed Dr. Liang that J.F. was toilet trained at age two but complained of abdominal pain and could not control his bowel movements. *Id*. Gaines stated that some of J.F.'s words were not clear, but that she could understand him and that he may have some behavioral problems because he was hyperactive. *Id*. Dr. Liang noted that J.F. was well-developed and well-nourished. (Tr. 254). The doctor noted that J.F. was taking MiraLAX to control his bowel movements, and that the bowel movements have been improving daily. (Tr. 255). Dr. Liang diagnosed J.F. with bowel incontinence and urine incontinence. *Id*.

On July 13, 2015, J.F. underwent an upper GI study, which revealed evidence of malrotation but no evidence of stricture or obstruction in the small bowel. (Tr. 249).

On August 17, 2015, J.F. had an initial examination with a pediatric surgeon for complaints of abdominal pain and dark urine. (Tr. 260). The doctor noted that although previously prescribed MiraLAX, Gaines was not giving it to him. (Tr. 261). A physical examination revealed an umbilical hernia and no signs of obstruction. (Tr. 262). The doctor prescribed MiraLAX. (Tr. 263). The doctor noted that J.F. had urinary incontinence and was not toilet trained. (Tr. 263). The doctor further noted J.F. "has an incidental easily reducible umbilical hernia. Repair is indicated at age 5

years if it has not resolved." *Id*.

On August 26, 2015, J.F. met with clinical psychologist Natalie Meyer, Psy.D. (Tr. 266). Gaines stated that she applied for benefits on behalf of J.F. due to his history of surgery. (Tr. 267). Gaines reported that J.F. was very friendly and had no history of behavioral support or mental health services. (Tr. 268).

Dr. Meyer noted that J.F. was able to name colors, recite part of the alphabet, and count to four. (Tr. 270). Dr. Meyer opined that J.F. had adequate attention to task for his age, and that there were no reported concerns about attention. *Id*. Dr. Meyer noted that J.F. interacted appropriately with her and Gaines and that he reportedly got along well with his peers and teachers. *Id*. There were few significant behavioral concerns reported at home or school. *Id*. Dr. Meyer noted that J.F. did not have a history of early intervention or special education services. (Tr. 271). She explained that J.F. required assistance to complete grooming and hygiene and was cooperative with tasks at home. (Tr. 270).

On September 29, 2015, J.F. underwent a speech language evaluation. (Tr. 275). Gaines reported that J.F. was smart and his medical issues were her main concern. *Id*. J.F.'s speech was 70% intelligible with a mild articulation disorder, mild receptive language disorder, and mild expressive language disorder. (Tr. 276). J.F. scored in the tenth percentile for articulation, the eighth percentile for auditory comprehension, the ninth percentile for expressive communication, and his total language score was in the seventh percentile. *Id*. Examiners recommended speech-language therapy. (Tr. 277).

In September and October of 2015, state agency consultants Leslie Rudy, Ph.D., Lisa Lynch, MA, CCC-SLP, and Frank Stroebel, M.D. reviewed J.F.'s file. (Tr. 79). The consultants determined that that J.F. had severe impairments of speech and language and disorder of the

gastrointestinal system. (Tr. 77). These impairments resulted in less than marked limitation in the domain of inquiring and using information; no limitation in the domain of attending and completing tasks; less than marked limitation in the domain of interacting and relating with others; no limitation in the domain of moving about and manipulating objects; no limitation in the domain of caring for yourself; and less than marked limitation in the domain of health and physical well-being. (Tr. 78-79).

On October 8, 2015, J.F. visited Dr. Eric Friess to get immunizations to attend preschool. (Tr. 348). The doctor's note states "[patient] with unchecked behavior in the exam room and mom hoping to get him into Head Start/Pre K soon." (Tr. 348). On October 23, 2015, J.F. visited Dr. Laurie Ekstein for a well child visit. (Tr. 358). Gaines informed Dr. Ekstein that J.F. was not sleeping and had behavior problems. *Id.*

On November 4, 2015, J.F. visited Applewood Center for a mental health assessment for hyperactivity. (Tr. 294). The Provider indicated that J.F. met the criteria for other specified disruptive impulse-control disorder as evidence by hyperactivity and difficulty listening and following directions, and sleep disturbance. (Tr. 300). The Provider recommended behavior health counseling at least twice per month with family involvement to improve parenting skills, behaviors. (Tr. 301). Gaines requested psychiatry for medication to help with J.F.'s hyperactivity. *Id.* J.F. attended two out of eight scheduled therapy sessions between November 11, 2015 and February 2, 2016. (Tr. 290). Due to J.F.'s failure to attend his scheduled sessions, the agency terminated him for non-participation in services. (Tr. 292).

On January 24, 2017, J.F. visited Dr. Miyasake, a pediatric surgeon, for a routine health maintenance check regarding his abdominal pain. (Tr. 448). Gaines stated that J.F. has had abdominal pain since his surgery in 2011; and that he had pain every few weeks and would refuse

to eat. (Tr. 448). J.F. did not exhibit anxiety, depression, or emotional problems. *Id.* Dr. Miyasake noted his impression of abdominal pain of unclear etiology and sought J.F.'s prior medical records. Dr. Miyasake suggested a follow up appointment after receipt of J.F.'s medical records. (Tr. 449). J.F. followed up with Dr. Miyasake on February 7, 2017. (Tr. 450). Dr. Miyasake determined that J.F. had a history of chronic abdominal pain and that his umbilical hernia repair could proceed after a more thorough GI evaluation. (Tr. 451).

### B.    Opinion Evidence

The ALJ's decision notes that "no treating physician, psychiatrist, or psychologist has made a statement suggesting the claimant's impairments have resulted in disabling functional limitations." (Tr. 21).

### C.    Other Source Information

On February 21, 2017, J.F.'s kindergarten teacher, Cristal Elkins-Chambers, completed a teacher questionnaire. (Tr. 207-209). Ms. Elkins-Chambers reported that J.F. was in a regular education classroom. (Tr. 207). In addition, the teacher noted that J.F. was absent from school twenty-two out of one-hundred-fifteen days; he was struggling to master letters, sounds, number identification and math; he was "in intensive interventions…for struggling readers" and that he would "most likely be retained" in kindergarten. (Tr. 208). According to Ms. Elkins-Chambers, J.F. "loses focus; moves a lot when involved in small group centers" but "[w]hen working [with] teacher he tries hard and participates." *Id.* She further noted that J.F. had issues with blending sounds and could not recognize letters in his name. *Id.*

### D.    Relevant Hearing Testimony

The ALJ requested that J.F. appear at the hearing. J.F. stated that he was five years old and in kindergarten. (Tr. 37). The ALJ then excused J.F. and took testimony from Gaines. *Id.*

Gaines testified that J.F. had abdominal surgery when he was four months old. (Tr. 39). Since the surgery, J.F. experienced pain which affected his appetite, his sleep, and caused him to miss school. (Tr. 43). Gaines explained that J.F. had problems controlling his urine and had about three accidents a week. *Id*. J.F. had problems controlling his bowel movements about once a week and would tell Gaines that he could not feel it happening. (Tr. 44). Gaines testified that J.F. used an inhaler about three times a week for asthma, and sometimes required the use of a breathing machine. *Id*. J.F. also had issues with eczema on his face and body. (Tr. 48).

Gaines testified that J.F.'s doctor suggested she take him to Applewood. (Tr. 46). Gaines explained that J.F. was on sleeping medicine and that he was hyperactive. (Tr. 46). Before putting J.F. on medication for hyperactivity, his doctors suggested counseling with Applewood twice a week. (Tr. 46). Gaines testified that it was hard to calm J.F. down; he would "run all over the place," would not sit still, and it was "hard for him to stay focused." (Tr. 47). Gaines reported that J.F. had to repeat kindergarten. *Id*.

### E.    Post Hearing Psychological Evaluation

After the hearing, the ALJ referred J.F. for a psychological evaluation. (Tr. 453-58). On May 2, 2017, Michael Faust, Ph.D., conducted the psychological evaluation. *Id*. Dr. Faust noted that J.F. fidgeted in his chair and presented with signs of hyperactivity. (Tr. 455). J.F. exhibited difficultly with distractions, impulsiveness and fidgeting. *Id*. Gaines reported that J.F. was diagnosed with symptoms of ADHD by his primary care physician but had never been prescribed medication to control the behavioral manifestations of the disorder. (Tr. 457). J.F.'s speech was 100% understandable, he showed no problems understanding directions, and he presented with articulate speech for his age. (Tr. 455). Dr. Faust opined that J.F. would have trouble learning due to significant deficits and increased behavioral levels in the classroom. (Tr. 457). He further noted

that J.F. would have difficulty sustaining attention for prolonged periods of time and would require redirection from adults in a group setting to complete assigned tasks. (Tr. 457). Dr. Faust further opined that J.F. could be expected to exhibit some mild difficulty in interacting and relating to others secondary to his continued symptoms of ADHD. (Tr. 458). Dr. Faust reported that J.F. exhibited symptoms of attention deficit and increased behavioral levels, which would impact upon his ability to engage in self-care activities daily. *Id.*

## IV.    Disability Standard

The standard for evaluating a child's disability claim is different from the standard used for an adult disability claim. *Hernandez v. Astrue,* No. 1:10CV1295, 2011 U.S. Dist. LEXIS 118601, at *9 (N.D. Ohio Sep. 28, 2011) (citing) 42 U.S.C. § 1382c(a)(3)(C)(i); *Miller ex rel. Devine v. Comm'r of Soc. Sec.*, 37 F. App'x 146, 147 (6th Cir. 2002)). A child is disabled if he or she has a "medically determinable physical or mental impairment that results in marked and severe functional limitations and can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i).

An ALJ must proceed through a sequential analysis to determine whether a child is entitled to childhood SSI. 20 C.F.R. § 416.924(a). The three-step procedure requires the ALJ to determine whether a child:

> (1) is performing substantial gainful activity;
>
> (2) has a "severe" impairment or combination of impairments; and
>
> (3) whether the impairment or combination of impairments are of listing-level severity in that the impairment(s) either meets, medically equals or are the functional equivalent in severity to an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1 ("Listing").

*Phillips v. Astrue*, No. 1:11CV2412, 2012 U.S. Dist. LEXIS 90497, *3 (N.D. Ohio June 29, 2012),

(citing 20 C.F.R. § 416.924(a)-(d)).

For purposes of Step Three, to *meet* a Listing, the impairment(s) must be substantiated by medical findings shown or described in the listing for that impairment. 20 C.F.R. § 416.925(d). To *medically equal* a Listing, the impairment(s) must be substantiated by medical findings at least equal in severity and duration to those shown or described in the listing for that impairment. 20 C.F.R. § 416.926(a). To *functionally equal* a Listing, the impairment(s) must be of listing-level severity. In other words, it must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a).

When determining whether the impairment functionally equals the Listing, the ALJ considers all relevant factors, including, but not limited to: (1) how well the child can initiate and sustain activities, how much extra help he needs, and the effects of structured or supportive settings; (2) how the child functions in school; and (3) the effects of the child's medications or other treatment. 20 C.F.R. § 416.926a(a)(1)-(3).

To make a functionally equivalent determination, the ALJ begins by evaluating how the child functions on a daily basis and in all settings as compared to other children of the same age who do not have impairments. 20 C.F.R. § 416.926a(b). The ALJ considers how the child's functioning is affected during his activities at home, school and in his community in terms of six domains:

(i) acquiring and using information;

(ii) attending and completing tasks;

(iii) interacting and relating with others;

(iv) moving about and manipulating objects;

(v) caring for yourself; and,

(vi) health and physical well-being.

20 C.F.R. § 416.926a(b)(1)(i)-(vi).

The ALJ reviews these domains to determine if the child's limitations are marked or extreme. 20 C.F.R. § 416.926a(e). When assessing whether J.F. has marked or extreme limitations, the ALJ must consider the functional limitations from all medically determinable impairments, including any impairments that are not severe. 20 C.F.R. § 416.926a(a). The ALJ must also consider the interactive and cumulative effects of the impairment(s) in any affected domain. 20 C.F.R. § 416.926a(c).

A marked limitation is defined in part as a limitation that is "more than moderate" but "less than extreme." 20 C.F.R. § 416.926a(e)(1). It is the equivalent of the functioning expected on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. 20 C.F.R. §416.926a(e)(2)(i). A child has a marked limitation in a domain when the impairment "interfere(s) seriously with [the] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i).

An extreme limitation is the rating for the worst limitations. 20 C.F.R. §416.926a(e)(3). "However, 'extreme limitation' does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning that would be expected on standardized testing with scores that are at least three standard deviations below the mean." 20 C.F.R § 416.926a(e)(3)(i). An "extreme" limitation exists when the impairment "interfere(s) very seriously with [the] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i).

If the impairment meets, medically equals, or functionally equals the Listing, *and* satisfies the Act's duration requirement, then the child is considered disabled. 20 C.F.R. § 416.924(d)(1). If both requirements are not satisfied, then the child is not disabled. 20 C.F.R. § 416.924(d)(2).

10

### V.      Summary of the ALJ's Decision

The ALJ made the following findings of fact and conclusions of law:

1.   The Claimant was born on *** 2011. Therefore, he was a preschooler on February 26, 2015, the date application was filed, and is currently a preschooler (20 CFR 416.926a(g)(2)).

2.   The Claimant has not engaged in substantial gainful activity since February 26, 2015, the application date (20 CFR 416.924(b) and 416.971 *et seq.*).

3.   The Claimant has the following severe impairments: asthma; intussusception, malrotation and volvulus, status post Ladd's procedure; and attention-deficit hyperactivity disorder (20 CFR 416.924(c)).

4.   The Claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).

5.   The Claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings (20 CFR 416.924(d) and 416.926a).

6.   The Claimant has not been disabled, as defined in the Social Security Act, since February 26, 2015, the date the application was filed (20 CFR 416.924(a)).

(Tr. 18-32).

In reaching the conclusion that J.F. was not disabled, the ALJ evaluated J.F.'s abilities under all six domains of functioning and made the following findings:

1. Less than marked limitation in "acquiring and using information." (Tr. 23).

2. Less than marked limitation in "attending and completing tasks." (Tr. 24).

3. Less than marked limitation in "interacting and relating with others." (Tr. 25).

4. No limitation in "moving about and manipulating objects." (Tr. 26).

5. Less than marked limitation in "ability to care for yourself." (Tr. 27).

6. Less than marked limitation in "health and physical well-being." (Tr. 28).

**VI.    Law and Analysis**

    **A.    Standard of Review**

Judicial review of the Commissioner's decision is limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the whole record. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id*. However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

As a rule, the ALJ must build an accurate and logical bridge between the evidence and her conclusion. *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011); *see also Wilson v. Comm. of Soc. Sec.*, 378 F.3d 541, 544-546 (6th Cir. 2004). "Where the ALJ's decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Castello v. Commissioner of Social Sec.*, 5:09 CV 2569, 2011 U.S. Dist. LEXIS 13659, 2011 WL 610590, at *2 (N.D. Ohio Jan 10, 2011) (quoting *Giles v. Astrue*, 483 F.3d 483, 486 (7th

12

Cir. 2007) (internal quotation omitted); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995) (the ALJ's analysis must allow reviewing court to trace the path of her reasoning) (*Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

### B.    Gaines's Assignments of Error

Gaines asserts the ALJ committed two errors at Step Three of the sequential analysis. Both assignments of error focus on the ALJ's conclusions regarding the severe impairment of ADHD. During the Step Three analysis, the ALJ was required to consider whether J.F.'s impairment or combination of impairments either 1) meet, 2) medically equal(s) or 3) are the functional equivalent in severity to a listed impairment. 20 C.F.R. § 416.924(a)-(d). The ALJ determined that J.F.'s ADHD did not meet, medically equal, or functionally equal a listed impairment. Gaines contends such conclusions lack the support of substantial evidence.[2] The court will consider Gaines' second assignment error first, because the court's conclusion regarding that issue is also dispositive of the first assignment of error.

### 1.    Second Assignment of Error - Whether J.F.'s impairments were not functionally equivalent to a listed impairment.

Gaines contends that the ALJ erred in finding that J.F.'s impairments were not functionally equivalent to a listed impairment, because according to Gaines the record evidence established marked limitations in two of the six domains: 1) acquiring and using information and 2) attending and completing tasks.[3] (R. 11, PageID# 533). The Commissioner asserts that the ALJ's conclusions were reasonably supported by the evidence, and argues Gaines has failed to establish

---

[2]  Gaines does not take issue with the ALJ's other findings regarding the listed impairments.

[3]  Gaines does not challenge the ALJ's determinations regarding the four remaining domains; and, therefore, they are not addressed here.

otherwise. (R. 13, PageID# 551). The ALJ's decision must stand if reasonable evidence supports

the ALJ's conclusion, even if there is also evidence in the record that supports Gaines's argument.

*Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).

> The ALJ's decision, before specifically addressing the individual domains, concluded:
>
> The objective evidence, treatment history, and subjective allegations to treating
> sources are also inconsistent with Ms. Gaines's current testimony suggesting
> disabling cognitive limitations. Mental status examinations throughout the period
> revealed normal mood and affect. The consultative evaluation performed in May
> 2017 by Michael Faust, Ph.D., including Wechsler Preschool and Primary Scale
> of Intelligence III testing revealed a full scale IQ of 81, which was in the low-
> average range; but it was also noted that the claimant exhibited untreated ADHD
> symptoms during that evaluation. (Exhibit B12F, p. 5). As explained further
> below, a teacher questionnaire suggested the claimant struggled academically, but
> also revealed a high number of absences that may have accounted for at least
> some of his lack of progress. The evidence also demonstrated that the claimant's
> mother sought minimal treatment for concerns of behavioral or attention deficit
> symptoms, with only a brief period of services through Applewood Centers for
> those complaints in late 2015.

(Tr. 21). Moreover, the ALJ gave "considerable weight to the opinion of the consultative

psychologists, Drs. Meyer and Faust, who opined the claimant had some limitations, but not to a

'marked' or 'extreme' degree, in his age-appropriate functioning in the domains below." (Tr.

22). The ALJ noted "[t]here was no significant change in the claimant's symptomology or

treatment between these two visits. In fact, Dr. Faust noted improvement in the claimant's

language functioning compared to the earlier observations of Dr. Meyer." *Id.*

### a)   Acquiring and Using Information.

In the domain of acquiring and using information, the Commission considers how the child

acquires or learns information and how well the child uses the information she or he has learned.

20 C.F.R. § 416.926a(g). This domain involves how well a child perceives, thinks, remembers,

and uses information in all settings, including daily activities at home, school, and in the

14

community. 20 C.F.R. § 416.926a(g). These considerations are age specific. Preschool children,

ages three to six, "should begin to learn and use the skills that will help [them] to read and write

and do arithmetic" when older. 20 C.F.R. § 416.926a(g)(2)(iii).

A child should have the "readiness skills" by the time she or he begins first grade. *Id*.

For example, listening to stories, rhyming words, and matching letters are skills
needed for learning to read. Counting, sorting shapes, and building with blocks are
skills needed to learn math. Painting, coloring, copying shapes, and using scissors
are some of the skills needed in learning to write. Using words to ask questions,
give answers, follow directions, describe things, explain what you mean, and tell
stories allows you to acquire and share knowledge and experience of the world
around you.

20 C.F.R. § 416.926a(g)(2)(iii).

In finding that J.F. has less than marked limitation in acquiring and using information, the

ALJ addressed the domain as follows:

The claimant's mother has made conflicting statements regarding his functioning
in this area, describing the claimant as bright or "smart" to treating or examining
sources, stressing that his physical impairments were her main concern, but alleging
at the hearing that she feels he has an intellectual or learning impairment. (Exhibit
B5F, p. 3). While the claimant's mother indicated that she was in the process of
working with his school to obtain special education services, there was no evidence
of such in the record at the time of the hearing. The claimant achieved low-average
achievement on intelligence testing during the most recent consultative
psychological evaluation, with a full-scale IQ of 81, but Dr. Faust also noted
distractibility and hyperactivity during the examination that may have affected that
performance. The psychologist noted that these symptoms were untreated with
medication. (Exhibit B12F, p. 6). Dr. Faust observed the claimant could understand
simple or more complex instructions, but would likely have some difficulty
learning and retaining new information in a group situation due to his ADHD
symptoms, which were untreated. Dr. Faust also emphasized he was unable to
confirm the presence of any diagnosable learning disorder without additional
achievement testing, and that the claimant's attention symptoms were likely
interfering in this area. (Exhibit B12F, p. 7).

While the undersigned has considered the subjective reports, and additional
evidence received at the hearing level, to find some limitation in this area (contrary
to the findings of the DDS consultants, who indicated no limitations in this
functional domain), the weight of the evidence is inconsistent with "marked" or

15

"extreme" limitations in this area. The claimant has currently untreated attention deficit and hyperactivity symptoms, which may interfere with his abilities in a school environment, but would likely improve with appropriate interventions. Despite the untreated nature of his ADHD, the claimant achieved low-average scores on intellectual testing, and by the time of the 2017 evaluation with Dr. Faust, demonstrated no significant receptive or expressive language problems.

(Tr. 23-4).

Gaines contends that the evidence shows that J.F.'s ADHD causes him to function below the expected level of functioning based on his IQ score, as evidenced by his kindergarten teacher Ms. Elkins-Chamber's above-referenced questionnaire. (R. 11, PageID #533). Notably, the ALJ considered the teacher's questionnaire, but gave limited weight to the opinions therein because "the post-hearing consultative examination with Dr. Faust demonstrated [J.F.] was in the low-average range of intellectual functioning, and was most likely having academic issues due to untreated ADHD symptoms." (Tr. 22). The ALJ further relied upon the consultative psychological examination performed by clinical psychologist Dr. Meyer, which also noted that J.F. functioned in the low-average range of intelligence. *Id*. The ALJ reasonably concluded that these reports contradicted Ms. Elkins-Chamber's observations. In addition, as the ALJ concluded, "the teacher noted that [J.F.] had been enrolled for 115 days at the time of her report, but had been absent 22 of those days due to 'medical issues' per the reports of his mother," which the ALJ assessed may account for some of his academic difficulties. *Id*. Gaines does not set forth an assignment of error challenging the weight the ALJ afforded to Ms. Elkins-Chamber's opinion. (R. 11, PageID# 532-35). Instead, Gaines disagrees with the ALJ's conclusion on this domain.

The underlying decision demonstrates that the ALJ sufficiently considered the evidence of record—including the teacher's questionnaire, Dr. Meyer's report and Dr. Faust's report—and explained the decision regarding the domain of acquiring and using information. The relevant issue

16

is not whether there is evidence to support a ruling different than that reached by the ALJ. *LeBron ex rel. R.L. v. Commissioner*, No.1:13CV1355, 2014 U.S. Dist. LEXIS 103251, 2014 WL 3749221, at *11 (N.D. Ohio July 29, 2014). Rather, the Commissioner's determination must stand if supported by substantial evidence, regardless of whether some evidence might support another conclusion. See *Brown ex rel. JK v. Astrue*, 306 Fed. Appx. 636, 2009 WL 59167, at *1 (2d Cir. 2009); *Kidd v. Commissioner*, 7 Fed. Appx. 483, 2001 WL 345787, at *3 (6th Cir. 2001); *Martin ex rel. Martin v. Chater*, 91 F.3d 144, 1996 WL 428403, at *4 (6th Cir. 1996) (per curiam); *Mullen*, 800 F.2d at 545; *Kinsella,* 708 F.2d at 1059. Here, the ALJ's determination is supported by substantial evidence; and therefore, Gaines's assignment of error on this issue is overruled.

### b)      Attending and Completing Tasks

The domain of "attending and completing tasks" considers:

> how well you are able to focus and maintain your attention, and how well you begin, carry through, and finish your activities, including the pace at which you perform activities and the ease with which you change them.

20 C.F.R. § 416.926a(h).

Preschool children, ages three to six, "should be able to pay attention when you are spoken to directly, sustain attention to your play and learning activities, and concentrate on activities like putting puzzles together or completing art projects. You should also be able to focus long enough to do many more things by yourself, such as getting your clothes together and dressing yourself, feeding yourself, or putting away your toys. You should usually be able to wait your turn and to change your activity when a caregiver or teacher says it is time to do something else." 20 C.F.R. §416.926a(H)(2)(iii).

In finding that J.F. has less than marked limitation in attending and completing tasks, the

ALJ addressed the domain as follows:

> The claimant's kindergarten teacher noted difficulty with focus, especially during group situations, but this improves when working one-on-one with a teacher. As explained above, the claimant exhibited hyperactivity and impulsiveness during the consultative evaluation performed by Dr. Faust in May 2017, but a lack of treatment for ADHD was noted. The claimant had a history of briefly treating at Applewood Centers for behavior concerns, but was discharged from that agency within months due to failure to return for follow-up appointments. (Exhibit B7F). Still, there is no evidence that the claimant's mother complained of significant behavioral problems to their primary care pediatrician during well care visits or other specific visits for acute concerns. Mental status evaluations generally revealed normal cognition and behavior status during office visits.
>
> While the undersigned has considered the subjective reports, and additional evidence received at the hearing level, to find some limitation in this area (contrary to the findings of the DDS consultants, who indicated no limitations in this functional domain), the weight of the evidence is inconsistent with "marked" or "extreme" limitations in this area. The Claimant has currently untreated attention deficit and hyperactivity symptoms, which may interfere somewhat in this area. Despite the untreated nature of his ADHD, the Claimant achieved low-average scores on intellectual testing, and by the time of the 2017 evaluation with Dr. Faust, demonstrated no significant receptive or expressive language problems.

(Tr. 24-5).

Gaines contends that the ALJ failed to fully consider the limitations set forth in Ms. Elkin-Chambers' report and Dr. Faust's report. (R. 11, PageID# 534). According to Gaines, these reports establish that J.F. had serious limitations in the domain of attending and completing tasks. Gaines does not challenge the weight the ALJ assigned to these opinions, but rather contends that the ALJ failed to fully consider the reports. (R. 11, PageID# 533-34).

Although Ms. Elkins-Chambers' questionnaire addresses J.F.'s academic struggles, it does not connect these academic issues with difficulties in attending and completing tasks, or any specific issue with focus. With regard to focus, the kindergarten teacher's report is limited. She explained that J.F. "loses focus; moves a lot when involved in small group centers. When working with teacher he tries hard and participates[.]" (Tr. 208). This information establishes that J.F. does,

in fact, pay attention when his teacher speaks directly to him. 20 C.F.R. §416.926a(H)(2)(iii). The teacher further reported that he is in a regular education classroom with twenty-three students (Tr. 207), and "[o]ther student behaviors seem to take [J.F] off task. [J.F.] enjoys playing w/other[s] so if a student starts to play and not work[,] he follows." (Tr. 209). This suggests J.F. moves off task when *other children* are off task. (Tr. 208). The ALJ considers the domain of attending and completing tasks by comparing J.F. to other children of the same age who do not have impairments. 20 C.F.R. § 416.926a(b). The teacher's statement indicates that J.F's behavior is not out of line in comparison to his classmates in the regular education classroom.

Dr. Faust's report stated that J.F. had difficulty with distractibility and inattention in a one-on-one setting. (Tr. 457). Dr. Faust opined that J.F. would have difficulty sustaining attention for prolonged periods of time and would require redirection to complete tasks. (Tr. 457). J.F. would likely interrupt peers and be disruptive in a group situation because he is impulsive and hyperactive. (Tr. 457). The ALJ considered these statements and also indicated that "a lack of treatment for ADHD was noted[.]" (R. 24). Moreover, the ALJ reasonably relied upon the evidence to determine that notwithstanding "the untreated nature of [J.F.'s] ADHD, the claimant achieved low-average scores on intellectual testing, and by the time of the 2017 evaluation with Dr. Faust, demonstrated no significant receptive or expressive language problems." (Tr. 25). It is apparent from the underlying decision, quoted above, that the ALJ considered these opinions and weighed the record evidence—such as "no evidence that the claimant's mother complained of significant behavioral problems to their primary care pediatrician…" and "[m]ental status evaluations generally revealed normal cognition and behavior status during office visits[]"—to determine that J.F. had less than marked limitations in attending and completing tasks. (Tr. 24-25).

This court does not review the evidence *de novo*, make credibility determinations, or weigh

the evidence. *Brainard*, 889 F.2d at 681. Rather, the Commissioner's determination must stand if supported by substantial evidence, regardless of whether some evidence might support another conclusion. *See Brown ex rel. JK v. Astrue*, 306 Fed. Appx. 636, 2009 WL 59167, at *1 (2d Cir. 2009); *Kidd v. Commissioner*, 7 Fed. Appx. 483, 2001 WL 345787, at *3 (6th Cir. 2001); *Martin ex rel. Martin v. Chater*, 91 F.3d 144, 1996 WL 428403, at *4 (6th Cir. 1996) (per curiam); *Mullen*, 800 F.2d at 545; *Kinsella*, 708 F.2d at 1059. Here, the underlying decision demonstrates that the ALJ sufficiently considered the record and provided substantial evidence to explain the decision regarding the domain of attending and completing tasks.

Gaines's second assignment of error, therefore, is without merit.

### 2.    First Assignment of Error

In her first assignment of error, Gaines contends that the ALJ failed to properly evaluate whether J.F.'s ADHD met the listed impairment of Listing 112.11. (R. 11, PageID# 529). The court agrees, but as explained below, such error was harmless when considering the underlying decision as a whole.

To properly determine if J.F. met the listed impairment, Listing 112.11, the ALJ had to consider the following:

112.11 *Neurodevelopmental disorders* (see 112.00B9), for children age 3 to attainment of age 18, satisfied by A and B:

A. Medical documentation of the requirements of paragraph 1, 2, or 3:

    1.  One or both of the following:
        a.  Frequent distractibility, difficulty sustaining attention, and difficulty organizing tasks; or
        b.  Hyperactive and impulsive behavior (for example, difficulty remaining seating, talking excessively, difficulty waiting, appearing restless, or behaving as if being "driven by a motor").
    2.  Significant difficulties learning and using academic skills; or

20

     3.  Recurrent motor movement or vocalization.

AND

B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (*see* 112.00F):

     1.  Understand, remember, or apply information (*see* 112.00E1).
     2.  Interact with others (*see* 112.00E2).
     3.  Concentrate, persist, or maintain pace (*see* 112.00E3).
     4.  Adapt or manage oneself (*see* 112.00E4).

20 C.F.R. Pt. 404, Subpt P, App. I, §112.11.

The relevant portion of the ALJ's decision states:

Referencing Claimant's attention-deficit hyperactivity disorder (ADHD), there is also no evidence of a neurodevelopmental disorder that is serious and persistent, requiring a highly structured setting or resulting in minimal capacity to adapt to changes in the environment that are not a part of the J.F.'s daily life to meet Listing 112.11.

(Tr. 19). The Commissioner concedes that this statement does not reflect a proper evaluation of whether J.F.'s ADHD met the requirements of Listing 112.11. (R. 13, PageID# 547). "The ALJ appears to have mistakenly performed a brief analysis of the paragraph 'C' criteria of Listing 112.02 related to 'Neurocognitive Disorders,' instead of utilizing the criteria under Listing 112.11." (R. 13, PageID# 547).

The Commissioner argues that the ALJ's error is harmless because the ALJ's discussion of the elements pertaining to functional equivalence analysis is sufficient to establish that the J.F. did not actually meet or medically equal the listing. *Id*. Listing 112.11 requires J.F. to meet both paragraph A and paragraph B, quoted above. In reading the decision as a whole, the Commissioner asserts that the error becomes harmless because the ALJ nonetheless determined that J.F. did not meet the paragraph B requirements. (R. 13, PageID# 547).

An ALJ's failure to directly list the elements of a listing and then discuss the evidence of

record showing that a claimant does or does not meet that listing can be harmless error if the ALJ's ultimate Step Three finding is supported by factual findings made elsewhere in the record. *Campbell v. Comm'r of Soc. Sec*., No. 1:13 CV 329, 2013 U.S. Dist. LEXIS 182402, at *14 n.59 (N.D. Ohio Dec. 17, 2013) (citing *White v. Colvin*, No. 4:12-cv-11600, 2013 U.S. Dist. LEXIS 131775, at *21-22 (E.D. Mich. Sep. 16, 2013) (collecting cases, noting "[n]umerous courts have read *Bledsoe[v. Barnhart*, 165 F. App'x 408 (6th Cir. 2006),] as "implicitly endors[ing] the practice of searching the ALJ's entire decision for statements supporting his [S]tep [T]hree analysis.").

As set forth herein, the ALJ properly considered the six functional equivalence domains and determined that J.F.'s ADHD did not functionally equal a listed impairment. The paragraph B factors required for determining whether an impairment *meets* Listing 121.11 are encompassed in the ALJ's discussion of the six functional equivalence domains. Accordingly, because the ALJ performed a proper analysis of the record evidence when determining that J.F. did not functionally equal a listed impairment, the court finds the ALJ's error was harmless.

Gaines's first assignment of error does not provide a basis to reverse or remand the Commissioner's decision.

**VII.    Conclusion**

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

IT IS SO ORDERED.

s/ *David A. Ruiz*
David A. Ruiz
United States Magistrate Judge

Date: September 16, 2020